**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DANIEL SIMMONDS, as Personal
Representative for the
Estate of Daniel Simmonds,

        Plaintiff,                  Case Number: 09-12286

v.                                   HON. MARIANNE O. BATTANI

COUNTY OF GENESEE, JOSH DIRKSE,
JAMES COMSTOCK, KEVIN SHANLIAN,
and DOUGLAS GEORGE STONE,
Individually,

        Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT**

Before the Court is Defendants Comstock, Shanlian and Stone's Motion for Summary Judgment (Doc. No. 35), and Defendant Michigan State Police Trooper Dirkse's Motion for Summary Judgment Based on Qualified Immunity (Doc. No. 26). The Court heard oral argument on November 12, 2009, and at the conclusion of the hearing, granted Plaintiff's request for a continuance under Fed. R. Civ. P. 56(e), to depose the law enforcement officers who were present at the scene when Kevin Simmonds was shot. Plaintiff deposed Defendant officers and submitted a supplemental brief in opposition to the summary judgment motions. The parties appeared on January 19, 2010, for additional argument. For the reasons that follow, the Court **GRANTS** Defendants' motions.

## I. FACTUAL BACKGROUND

Plaintiff, Daniel Simmonds, Personal Representative for the Estate of Kevin Simmonds, sued Defendants, County of Genesee, Josh Dirkse, James Comstock, Kevin Shanlian, and Douglas Stone, alleging that law enforcement officers violated his son Kevin's constitutional rights on November 23, 2007, when Kevin Simmonds was shot and killed. See First Amended Complaint. The facts giving rise to the claim follow.

Around 5:00 p.m. on November 23, 2007, Lieutenant Shanlian, who was employed by the Genesee County Sheriff, overheard a radio traffic from 9-1-1 Central Dispatch about a hit-and-run accident. Because he was in the vicinity of the incident, Lt. Shanlian, who was off-duty, looked for the suspect vehicle, a gray, S-10 pick-up truck driven by a white male. Shortly thereafter, Lt. Shanlian heard another call concerning a domestic fight with possible gun involvement at 467 Simmonds Drive, the home of decedent Kevin Simmonds and his parents. (Genesee Defs.' Ex. A.)

Daniel Simmonds, Kevin's father, called 9-1-1 because his son had threatened to kill the parents of his former girlfriend. Daniel Simmonds informed the 9-1-1- operator that his son might be armed. A second 9-1-1- call was made by the mother of Kevin's former girlfriend, Beverly Carey, regarding Kevin's threats. (Genesee Defs.' Ex. G).

Michigan State Police Troopers Doug Kaiser and Defendant Trooper Dirkse were dispatched. They requested backup due to their distance from the location. Richfield Township Officer Bernard responded, as did personnel from the Genesee County Sheriff's Department--Defendant Lt. Shanlian, Defendant Deputy Comstock, and Sgt. Tucker.

Lt. Shanlian, Officer Bernard and Trooper Kaiser, and Deputy Comstock arrived at the Carey's residence and confirmed that Kevin Simmonds was not at the address. Trooper Kaiser remained at the Careys' house to take a complaint. (Genesee Defs.' Exs. A, B). The other officers went to Simmonds Drive where they met Sgt. Tucker, Deputy Stone, and Trooper Dirkse. The officers talked with Daniel Simmonds and decided to block off Simmonds Drive to prevent the suspect's escape. They planned to get shields and helmets and attempt negotiations with the suspect. (Genesee Defs.' Exs. A, C). Before the plan could be implemented, Kevin Simmonds drove up a two-track drive located on the property and met Trooper Dirkse and Sgt. Tucker. According to Deputy Stone, he arrived at the Simmonds' residence and assisted Trooper Dirkse in blocking the exit from a two track located on the property. Trooper Dirkse activated his overhead lights, as did Deputy Stone, and ordered Kevin Simmonds to show his hands and exit the vehicle. Instead, Kevin Simmonds shifted into reverse and backed down the two-track through the woods.

Trooper Dirkse and Sgt. Tucker followed the pick-up in their vehicles. Deputy Comstock and Officer Bernard jumped into Deputy Stone's vehicle, and pursued the pick-up. Lt. Shanlian remained at the house in case Kevin Simmonds returned on foot.

After the pick-up got stuck in the snow, the officers exited the vehicles and again repeatedly commanded Kevin Simmonds to show his hands. Deputy Stone approached the driver's side window from the rear. (Genesee Defs.' Exs. A, D). When he had positioned himself near the rear of the driver's door and partially opened the door, he yelled "Taser, Taser," and deployed his department issued taser model X26 at the driver. Id. According to Deputy Stone, he believed he had been successful because

Kevin rolled toward the passenger seat. Id.   When Kevin Simmonds leaned toward the center console and the passenger side of the vehicle, he placed his back to the officers who were positioned outside the driver's side door of the pick-up. Kevin Simmonds suddenly yelled he had a gun and turned abruptly toward the officers with his hands extended in a firing posture. Deputy Comstock and Trooper Dirkse fired their service weapons. (Genesee Defs.' Ex. A). Sgt. Tucker was unable to fire because Deputy Stone was in his line of fire. (Genesee Defs.' Ex. E). Deputy Stone stated he was certain Kevin was going to shoot him in the face and he turned his face and body toward the rear of the truck, hoping he would be shot in the back of his vest rather than his face. (Genesee Defs.' Ex. A). Officer Bernard sought cover.

After the shooting, Deputies Comstock and Stone began life saving efforts; however Kevin Simmonds did not survive.

## II. STANDARD OF REVIEW

The Federal Rule of Civil Procedure authorize this Court to grant summary judgment "if the pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact if there is no factual dispute that would affect the legal outcome of the issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether summary judgment is appropriate, this Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." Hawkins v. Anheuser-Busch Inc., 517 F.3d 321, 332 (6th Cir. 2008). However, a party opposing summary judgment "may not rely merely on allegations or denials in its own pleading;

4

rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). In assessing Plaintiff's excessive-force claim, the Court must construe all of the facts in the record "in the light most favorable" to Plaintiff. Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901 (6th Cir.2004), cert. denied, 544 U.S. 975 (2005). Only then can the Court consider whether "Defendants' actions were objectively unreasonable, which is 'a pure question of law.' " Chappell v. City of Cleveland, 585 F.3d 901, 909 (6th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n. 8 (2007)).

## III. ANALYSIS

### A. Qualified Immunity

In general, government officials are immune from civil liability under 42 U.S.C. § 1983 when performing discretionary duties, provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Government officials will not be held liable for mere mistakes in judgment, whether the mistake is in law or in fact. Groh v. Ramirez, 540 U.S. 551, 567 (2004).

The United States Supreme Court has set forth a two-prong test[1] to determine whether an officer-defendant is entitled to qualified immunity. Saucier v. Katz, 533 U.S. 194, 200 (2001). The first prong requires the reviewing court to inquire whether the facts, viewed in the light most favorable to the plaintiff, "show the officer's conduct

---

[1] The Court recently reiterated the benefits of the Saucier test in determining qualified immunity, but held that courts need not apply the analysis in a rigid two-step sequence. Pearson v. Callahan, 129 S.Ct. 808, 811 (2009)

violated a constitutional right." Id. at 201. The court must "concentrate at the outset on the definition of the constitutional right and [then] determine whether on the facts alleged, a constitutional violation could be found." Id. If a constitutional violation could be found, the second prong requires the court to decide whether a reasonable official would, at the time the act was committed, understand that his conduct violated that right. Id. A government official will be entitled to immunity as long as the conduct does not amount to a violation of a clearly established right of which a reasonable person would have known. Harlow, 457 U.S. at 818. A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." Saucier, 533 U.S. at 202.

Accordingly, the Court begins its analysis of this claim with the identification of the specific constitutional right allegedly violated by the defendants. See Graham v. Connor, 490 U.S. 386, 394 (1989). The Fourth Amendment guarantees an individual's right to be secure in his person against unreasonable searches and seizures without a warrant based upon probable cause, see U.S. CONST. amed. IV, and protects individuals from excessive force by the police. The Fourth Amendment's "objectively reasonable" standard is utilized when analyzing a plaintiff's excessive force claim. Graham v. Connor, 490 U.S. at 388.

The factors used to evaluate the reasonableness of a police officer's actions are: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

In determining whether an officer's actions were reasonable, the specific

> facts of each case are key. Courts should pay particular attention to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." While courts must look to the totality of the circumstances in determining whether a seizure was reasonable, they must be sure to view those facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

Kostrzewa, 247 F.3d at 639 (citations omitted).

For purposes of this motion, it is undisputed that Kevin Simmonds was not armed at the time of the shooting; that he was shot on private property inside his vehicle within minutes of his encounter with law enforcement officials; and that his vehicle was blocked in by the officers' vehicles. Just before the shooting took place, Kevin was talking on a two-way, walkie-talkie cell phone. It is further undisputed that his parents begged the officers not to harm his son, and that Daniel Simmonds begged the officers to let him speak to his son to diffuse the situation.

Nevertheless, Plaintiff's assertion that these facts demonstrate that Kevin posed no threat is advanced with 20/20 hindsight. It fails to account for the officers' knowledge of these facts at the time of the shooting. The officers repeatedly commanded Kevin to show his hands and get out of the vehicle. Kevin refused. Although after the shooting it was established that Kevin was not armed, the officers had reason to believe that Plaintiff might be armed and knew Kevin's father had characterized Kevin as "nuts," suicidal, and wanting to harm others. (Genesee Defs.' Ex. B). The officers also knew that Kevin Simmonds had made death threats against several people. His parents were afraid for their own safety and the safety of others. Finally, each witness deposed testified that Kevin yelled he was going to shoot and moved his hands as if he were

going to do so.

Looking at the totality of the circumstances leading up to the arrest, "from the perspective of a reasonable officer on the scene," the shooting was objectively reasonable. The officers do not have to wait to see a gun before firing. Once they perceived the threat of imminent harm, the officers are justified in using deadly force. Dudley v. Eden, 260 F.3d 722, 727 (6th Cir. 2001); see also Chappell v. City of Cleveland, 585 F.3d 901, 910 (6th Cir. 2009) (qualified immunity granted where teenager refused to drop knife and instead advanced on the officers, who were in close proximity, with the knife raised).

The factual inconsistencies raised by Plaintiff in his supplemental brief do not alter the Court's analysis because they do not demonstrate the existence of a genuine issue of material fact. Specifically, Plaintiff challenges the testimony of Trooper Dirkse, who asserted that Kevin swung the driver's side door wide open and got out of the vehicle with his hands held together "as if he was pointing or holding a gun, pointed it in the direction of myself and the other officers," and yelled "I have a gun, I have a gun." (Genesee Defs.' Ex. A, at 48). His testimony contrasts with the forensic evidence and the other officers testimony that Kevin Simmonds shot through the driver's side window, which was down. See Pl.'s Exs. E, Comstock Dep. at 44; Ex. D, Tucker Dep. at 63-64. According to Plaintiff it is unreasonable to believe the Officers' testimony that Kevin yelled he had a gun because of the discrepancies in the officers' testimony. The inconsistent testimony as to whether Kevin shot through the window or exited the vehicle is immaterial In light of the officers' uniform recital that he raised his hands as if to shoot and yelled that he had a gun. All of the officers perceived an immediate threat of serious harm.

In addition, Plaintiff asserts a genuine issue of material fact is created by the fact that Trooper Dirkse and Deputy Comstock shot simultaneously, inasmuch as Kevin Simmonds could not have been pointing his hands at both officers at the same time. The Court finds this argument unavailing for two reasons. First, Trooper Dirkse testified the two officers were standing close together, and second, as soon as Kevin Simmonds pointed in the direction of any officer and yelled he had a gun, the conduct that occurred was reasonable.

As further evidence that the officers' version of the events leading up to the shooting should not be credited, Plaintiff points to the testimony of Lt. Shanlian, who estimated he was three to four hundred feet away, but could hear the tires spinning, Pl.'s Ex. B at 45, the officers screaming commands, id. at 49, someone screaming I've got a gun, and handgun fire followed by shotgun fire, id. at 50. Plaintiff concludes that the officers are taking advantage of the fact that the only eye witnesses are law enforcement officers.

The supposition fails to create a genuine issue of material fact. No officer's deposition testimony contradicted his report made at the time of the incident. The challenge to the credibility of Lt. Shanlian is speculative. The Court therefore finds Trooper Dirkse and Deputy Comstock committed no violation of Kevin's constitutional rights. Their use of force was objectively reasonable under the circumstances. Accordingly, the Court has no need to determine whether the right was clearly established.

### B. Qualified Immunity relative to tasing

Plaintiff contends that, under the circumstances, Deputy Stone's use of the taser was grossly disproportionate to the amount of force needed to effectuate the arrest. In supporting this position, Plaintiff relies on Landis v. Cardoza, 515 F.Supp.2d 809 (E.D. Mich. 2007), aff'd 297 Fed. Appx. 453 (6th Cir. Oct. 16, 2008). In Landis, the plaintiff/personal representative sued on behalf of the decedent, Keiser, who was suspected of moving construction equipment into the highway and blocking traffic. Keiser ran away and was pursued by police officers. He continued to run after verbal commands to stop. The district court held that the officers used excessive force in attempting to arrest Keiser, given that minor offense, the fact that he was unarmed, knee deep in muddy water, and surrounded by at least four law enforcement officers. He was no longer trying to resist arrest, he had been struck by a baton, shocked with a taser, and pushed into a position that submerged his head in muddy water.

The facts in Landis, distinguish it from this case, and the Court finds the use of the taser was objectively reasonable. Plaintiff's excessive force claim is undermined by the fact that Kevin refused to show his hands and get out of his car. Although Simmons was not physically or verbally threatening anyone at the time the taser was used, Deputy Stone opted for nonlethal force in effort to gain compliance over a suspect who was noncompliant with repeated demands. Moreover, Deputy Stone had received information that Kevin had threatened to kill a former girlfriend and believed Kevin Simmonds was armed. Deputy Stone only used the taser after repeated verbal commands failed. In sum, Kevin had made serious threats against others, attempted to evade arrest by the officers, and refused to follow their verbal commands to get out of the truck and show his hands. The taser was used to avoid having to resort to physical

or lethal force, putting both Kevin and the other officers at risk of serious harm. See Alexander v. City of Shelby Tp., Slip Copy, 2009 WL 3241974 (E.D. Mich. October 8, 2009) (declining to find a constitutional violation occurred when an officer deployed a taser after repeated requests were not obeyed, given the plaintiff had shown a belligerent attitude, and threatened officers following his arrest). Therefore, the Court finds as a matter of law that use of the taser, albeit unsuccessful, was objectively reasonable under the circumstances.

The fact that not every officer heard Deputy Stone yell taser before he used it is immaterial to the Court's analysis.[2] Given the situation facing the officers, the rapidity with which the events unfolded, the fact that all the officers testified that they were yelling at Kevin to show his hands, no reasonable juror would expect each and every officer's attention or recollection to be identical.

### C. Supervisory Liability

Although he was off-duty, Lt. Shanlian was the ranking Genesee Sheriff Deputy at the scene. Under long standing Sixth Circuit precedent, Lt. Shanlian could be responsible for another officer's use of excessive force if he owed the victim a duty of protection against the use of excessive force. Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997). See also Bruner v. Dunaway, 684 F.2d 422, 426 (6th Cir. 1982) (holding that police officers who stood by and did nothing while the plaintiff was beaten by other

---

[2]For example, Plaintiff notes that Deputy Comstock testified that he did not know that Deputy Stone had tased Simmonds and denied hearing Deputy Stone yell taser, taser. See Ex. E, Comstock Dep at 43. According to Plaintiff, this testimony cannot be credited because Deputies Comstock and Stone were less than ten feet apart. Moreover, even though Deputy Comstock did not hear, Sgt. Tucker, who was standing on the opposite side of the vehicle, heard Deputy Stone. See Ex. D, Tucker Dep. at 61.

officers could be held liable under § 1983).

In light of the Court's finding that no constitutional violation occurred, this claim fails as a matter of law. Specifically, the Court has found that there was no officer used excessive force so there can be no basis for holding Lt. Shanlian liable. Moreover, even if excessive force had been used, Lt. Shanlian lacked the opportunity and the means to prevent the harm from occurring. It is undisputed that Lt. Shanlian was with at the family residence at the time Kevin Simmonds was shot. He was not physically present at the tasing or the shooting and could not have intervened given the instantaneous unfolding of events. Accordingly, he is entitled to summary judgment.

## IV. CONCLUSION

The Court therefore **GRANTS** Defendants' motions for summary judgment.

**IT IS SO ORDERED.**

    s/Marianne O. Battani
    MARIANNE O. BATTANI
    UNITED STATES DISTRICT JUDGE

Dated: March 25, 2010

## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

    s/Bernadette M. Thebolt
    Case Manager